E. GRADY JOLLY, Circuit Judge:
This appeal is from the denial of relief under 28 U.S.C. § 2255. The § 2255 motion asserts a claim that trial counsel rendered ineffective assistance by advising the appellant, Kenneth Earl Wines, not to testify in his federal criminal trial. Because he fails to demonstrate that he was *600 prejudiced, Wines has not established a constitutional violation and is not entitled to § 2255 relief. We therefore affirm the judgment of the district court.
I.
A.
We first recount the evidence presented at Wines’s criminal trial at which he was convicted by a jury. We will later deal with his § 2255 evidentiary hearing.
On September 30, 2002, sometime after three in the morning, in West Monroe, Louisiana, Marvin Chappell, a co-conspirator, was driving a Ford Expedition, belonging to Wines’s stepfather, a resident of Dallas, Texas. An Ouachita Parish sheriffs deputy pulled over Chappell, and Chappell consented to a search of the vehicle. The sheriffs deputy found nine ounces of crack cocaine hidden in the vehicle’s sound speakers. Officers questioned Chappell, who told them that the drugs belonged to a man named “Crazy.” Chappell agreed to cooperate with the sheriffs department to lure “Crazy” to a nearby truck stop, through the ruse of telling him that the Expedition had broken down there.
In order to contact “Crazy,” Chappell called a “girl named Felicia.” Then, Felicia made a three-way call to Wines’s phone. Wines handed the phone to Bernice Woodson, Wines’s long-time friend and co-conspirator; and Chappell informed Woodson of his car troubles. Wines, Woodson, and Aurora Shine — Woodson’s girlfriend — arrived at the truck stop parking lot in the same rental car. After the group talked to Chappell about the breakdown, they drove away to a nearby gas station. Once the group arrived at the gas station, Woodson exited the car, walked back toward Chappell at the truck stop, and began talking to an undercover officer, who was posing as an auto mechanic. As Woodson was talking to the undercover agent, Wines and Shine drove away, leaving Woodson stranded at the truck stop. Woodson was arrested at the truck stop, and the officers, following Wines’s and Shine’s car, arrested them.
Ouachita Parish Sheriffs Department Deputy Bob Morris testified at trial that, upon arrest, Chappell knew Wines by the name of “Crazy” and that Chappell identified Wines as his Dallas-area drug supplier. Further, Woodson, upon arrest, affirmatively identified Wines as the group’s supplier.
After he was arrested, Woodson told agents the location of Wines’s house in Dallas and that Wines kept several firearms in the house. Dallas County Sheriffs Department officers searched the home at 1651 Blue Meadow Street and seized 262 grams of crack cocaine, 226 grams of marijuana, two digital scales, seven firearms, and $31,110 in cash. During the search, the Sheriffs Department officers found a rent receipt for the house made out to “Tyrone Davis.”
In 2004, Wines was indicted for conspiracy with intent to distribute cocaine base (count 1), conspiracy to distribute marijuana (count 2), possession with intent to distribute cocaine base (count 3), and possession of a firearm in furtherance of and in relation to a drug trafficking crime (count 4).
B.
At the criminal trial that followed, Woodson testified that the night before the arrests he was at Wines’s house at 1651 Blue Meadow Street. He said that he watched Wines cook crack cocaine and, then, Wines hid the cocaine in the speaker box of the Expedition, which Chappell was driving. Chappell left that night for Lake Providence, Louisiana. Wines and Wood-son were not too far behind Chappell, because they both had a mandatory criminal *601 court appearance in Monroe, Louisiana at ten o’clock the next day, apparently concerning a marijuana charge committed in the area, which included Lake Providence.
According to Woodson, he had once been the “big man” in a drug conspiracy and was ten years older than Wines. However, because of his multiple stints in prison and his large amount of attorney’s fees, Woodson had lost his drug kingpin status and was working for Wines at the time of the incident. Woodson further testified that although the men had known each other for more than a decade, they had lost touch for quite a while. They reunited during a chance encounter at a gas station, and Wines recruited Woodson to drive him to Lake Providence, Louisiana to sell crack cocaine and marijuana.
Altogether, the men took at least nine of these interstate, drug-selling road trips to the Lake Providence area before they were arrested on the present charges. Woodson testified that he introduced Wines to Chappell, a man who fathered a baby with Woodson’s sister. After he was recruited into the operation, Chappell assumed responsibility for transporting the drugs to Lake Providence.
In addition to Woodson, the owner of the house at 1651 Blue Meadow Street, Lorene Smith, testified for the government. Smith said that she had leased the home to “Tyrone Davis,” that she had met “Tyrone Davis” four times, and that she received payment for the rent through money order from him. She specifically identified Wines as “Tyrone Davis.”
After the prosecution rested, the defense presented its case. Wines’s defense attorney called only two witnesses: Chappell, who invoked his right to remain silent under the Fifth Amendment, and Erma Wines, Wines’s mother. The defense attorney did not call Wines to testify.
Erma Wines, who also lived in Dallas, testified during direct examination that Wines had been living with her since March 2002, almost six months before the traffic stop in Ouachita Parish. She also said that she knew that Woodson and Chappell moved into the Blue Meadow house after Wines moved out and testified to seeing the men there playing dominoes on more than one occasion. She further testified that Wines had been at her house for a barbeque on the night before Wines’s arrest until almost 2:30 a.m. and then he left for Monroe. When asked during cross-examination how she knew Woodson, she testified that she had met him in 1993 when Wines “got his ... first case.” She said that Woodson and others gave Wines “a sack” and told him to “run with it and put it up.” Wines’s mother also said that the drug involved was cocaine and that Wines went to jail for the offense.
A jury found Wines guilty on all four counts: conspiracy with intent to distribute cocaine base, conspiracy to distribute marijuana, possession with intent to distribute cocaine base, and possession of a firearm in furtherance of and in relation to a drug trafficking crime. The district court sentenced him to 360 months of imprisonment on the first three counts, to be served concurrently, and sixty months of imprisonment on count 4, to 'be served consecutively. Thus, Wines was sentenced to a total of 420 months of imprisonment (35 years). Wines’s conviction and sentence were affirmed by this court on direct appeal.[1]
II.
We now turn to the § 2255 proceeding before us. After he exhausted his reme *602 dies on direct appeal, Wines filed a pro se 28 U.S.C. § 2255 motion in which he asserted that his trial counsel was ineffective for (1) failing to investigate Chappell; (2) failing to subpoena certain witnesses; (3) failing to question the fact that Woodson gave a written statement to law enforcement officers, despite Woodson admitting that he was unable to read or write; (4) failing to question the fact that all of the evidence against Wines was provided by Shine; (5) failing to adequately discuss Wines’s case with him; (6) refusing to pursue courses of action at Wines’s request; and (7) failing to call Wines to testify even though Wines instructed him to do so. In reply to the government’s answer to his § 2255 motion, Wines further asserted that if he was allowed to testify, he would have informed the jury that he never traveled from Dallas to Louisiana with Chappell and that he and Chappell were “enemies.” Wines also requested an evidentiary hearing.
The district court appointed the Federal Public Defender to represent Wines and granted Wines’s request for an evidentiary hearing regarding his claim that his counsel was ineffective for failing to allow him to testify at trial.
At the evidentiary hearing, which was assigned to a magistrate judge, only two people testified: Wines and Wines’s trial counsel, Walter Caldwell IV.
Wines testified that he was living at his mother’s house in Dallas at the time of the incident at the Louisiana truck stop. He said that the night before his arrest in West Monroe, he was at his mother’s house until almost 2:00 a.m. Almost an hour after the barbeque ended, Woodson arrived and asked Wines if he wanted to ride together to Monroe for their court appearance. Wines agreed, and the men traveled to Monroe for their court appearance without incident.
However, on their way out of court that morning in Monroe, someone called Wines’s mobile phone and asked to speak to Woodson. After talking on the phone, Woodson asked if they could stop off in West Monroe, Louisiana to help a friend. Wines told him that was not a problem.
Once the men arrived — along with Shine — at the truck stop on Well Road, Woodson got out of the car to help his friend, Chappell, and then came back and said that he needed to be taken to a “part house” to get a part that was needed for the car Chappell was driving. The men could not find the “part house,” so Wood-son got out of the car and walked back to the truck stop. Wines then drove back toward Dallas with Shine but was soon arrested in West Monroe.
Wines further testified that he had lived in the Blue Meadow residence with his “baby mom,” but they had separated and moved out, and Woodson moved in after-wards for about eight or nine months until the arrests. Wines also stated that his nickname was “K-Love,” not “Crazy” and that he never used “Tyrone Davis” as an alias.
Wines testified that when he talked to his trial counsel about testifying, his lawyer told him that the government would bring up his prior convictions. Wines explained that “a couple” of the offenses were committed by someone using his name, but he did admit to committing the 1992 or 1993 offense for possession of drugs with the intent to distribute.
Wines said that after all of the witnesses had testified, he asked his counsel whether he was going to allow him to take the stand, and his counsel responded that he was “comfortable” with the way things were progressing at trial. Wines stated that he told his trial lawyer that “he could at least give [Wines] a chance to fight for [his] life” because he was not confident *603 with what he had seen. Although counsel told Wines that his past was an issue, Wines responded that his past was already known through his mother’s testimony. Wines elaborated that he did not complain at trial about not being allowed to testify because he did not know that he could complain and, in any event, he did not know how to raise the issue on his own.
Wines testified that he did not make any statements to police after his arrest because he “wasn’t aware of what was going on” and because he was “lost.” He also denied knowing that Chappell had drugs in the car and denied assisting Chappell by loading the drugs into Wines’s stepfather’s Expedition.[2] Wines also said that he was prepared to testify at the time of trial and that he would have testified consistently with his evidentiary hearing testimony. He says that he would have told the jury that he was innocent.
Wines’s trial counsel, Walter Caldwell IV, also testified at the evidentiary hearing. He said that he could not remember any specific conversations that he had with Wines during trial, but “I certainly know that at some point we probably discussed it and I probably advised him against it.” Caldwell was sure that he had never told any of his clients that “[y]ou cannot testify” or that “[y]ou must testify.” He continued that “I’ve always told that person, ‘that’s one of the decisions you get to make in this case is whether or not you testify.” He understood that he “certainly” could not have “preclude[d] Mr. Wines from testifying at trial.” Caldwell told the court that he had a preference against allowing his clients to testify because he has “found that individuals that tend to testify, a lot of times end up hanging themselves.” He stated that if Wines had been called to testify, the government would have quickly asked him about his prior conviction of a drug-related charge. Additionally, there was no need for Wines to testify because he had not made any statements to the police that needed to be explained.
Ultimately, after hearing the testimony from both Wines and his trial attorney, the magistrate judge recommended that Wines’s § 2255 motion be denied. The magistrate judge determined that Wines had not proved his counsel was ineffective for failing to call Wines to testify. The magistrate judge further determined that Wines had not overcome the strong presumption that his counsel’s decision was the result of sound trial strategy, because evidence of Wines’s prior convictions would have been introduced and there would have been a subsequent jury instruction reminding the jury about the convictions. The magistrate judge also found that even if trial counsel’s decision was not sound trial strategy, Wines had not shown that he was prejudiced by counsel’s failure to call Wines as a witness. Furthermore, the magistrate judge found that there were no other grounds upon which Wines was entitled to habeas relief.
The district court adopted the magistrate judge’s Report and Recommendation, almost in its entirety, and denied Wines’s § 2255 motion.
In addition to denying Wines’s § 2255 motion, the district court denied Wines a certificate of appealability (“COA”). Wines then sought a COA from this court. We concluded that Wines had not shown that the record supported a determination that his counsel prevented him from testi *604 lying at trial. We held, however, that Wines had shown that reasonable jurists would find it debatable whether the district court committed reversible error when it determined that Wines’s counsel was not ineffective for advising him not to testify at trial.
Thus, the only issue before the panel at this time is whether Wines’s trial counsel rendered ineffective assistance by advising him not to testify on his own behalf.
III.
In determining whether counsel’s performance was ineffective, we apply the familiar test of Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). See Pape v. Thaler, 645 F.3d 281, 288 (5th Cir.2011). To establish that counsel was ineffective, the defendant must prove: (1) “that counsel made errors so serious that counsel was not functioning as the ‘counsel’ guaranteed the defendant by the Sixth Amendment” Strickland, 466 U.S. at 687, 104 S.Ct. 2052 and (2) “that the deficient performance prejudiced the defense.” Id. To prove that trial counsel’s deficient performance prejudiced the defense, the defendant must demonstrate that “there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Id. at 694, 104 S.Ct. 2052. “A reasonable probability is a probability sufficient to undermine confidence in the outcome [of a criminal trial].” Id. This is a heavy burden which requires a “substantial,” and not just a “conceivable,” likelihood of a different result. Harrington v. Richter, — U.S. -, 131 S.Ct. 770, 787, 178 L.Ed.2d 624 (2011); see also Cullen v. Pinholster, — U.S. -, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011).
To save ink, paper, and time, we will assume, without deciding, that Wines’s trial counsel performed deficiently, because even assuming Wines’s counsel was ineffective, Wines suffered no prejudice.
At the outset, we should note that Wines was convicted of conspiracy to possess with intent to distribute cocaine base (count l)[3] and conspiracy to distribute marijuana (count 2).[4]
[5] Significantly, at the evidentiary hearing, Wines offered no defense that would have addressed these convictions except to the extent that they involved the September 30 arrests. For example, in the indictment, the government alleged that the conspiracy involving Wines as well as unnamed others started in 1998 and continued until 2002. Thus, the conspiracy significantly preceded the discovery of nine ounces of crack cocaine in Wines’s stepfather’s car and the co-conspirators’ consequent arrests in West *605 Monroe. In fact, Woodson testified at trial that Wines approached him at a gas station to travel with him to Lake Providence and conduct a drug business. Woodson further testified that he took at least nine trips to Lake Providence with Wines to deal drugs. Wines does not purport to deny this drug conspiracy. Wines’s proposed testimony only denies that he had traveled with Chappell to Louisiana to sell drugs. Thus, even if Wines had testified, these convictions would remain unchallenged.
We now turn to examine Wines’s testimony regarding his convictions for the September 30, 2002 possession with the intent to distribute cocaine base conviction (count 3) and the possession of a firearm in furtherance of a drug trafficking crime conviction (count 4).
First, if he testified in his own defense at trial, Wines’s credibility would have undergone a scorching cross-examination. Wines would have had to admit that he was in the illicit drug business and that Woodson was his good friend and associate, and he would have had to answer to his longtime drug dealing in Lake Providence. Prosecutors would have introduced impeachment evidence of his conviction for possession with intent to distribute cocaine. Although his mother had already mentioned that he had previously been “busted” for cocaine, the prosecutors would have been able to further attack his credibility by introducing evidence of his conviction for the offense, the name of the offense, and the sentence imposed. Although Wines argues that the cat was already out of the bag regarding this conviction, he had a whole clowder of cats in the bag that had yet to escape. In addition to Wines’s 1993 possession with intent to distribute cocaine conviction, Wines’s pre-sentence report reveals other convictions that show a pattern of his illegal behavior that would have been available to challenge the credibility of his innocence plea, including: convictions in 1999 and 2000 for unlawfully carrying a weapon, a 1997 conviction for evading arrest, a 2001 conviction for possession of marijuana, and a 2000 conviction for assault.[6] Wines claims that he was innocent of some of these convictions, because “[sjomebody was using my identity.” Given that the process of convicting a defendant involves finger-printing, computer checks, and other modern technology designed to authenticate the identity of a defendant, Wines’s assertion that someone else was convicted under his name of the offenses listed in his pre-sentence report would undoubtedly cast him as a deceitful witness.
Furthermore, outside of his bare assertions of innocence of these particular charges, Wines’s account of events given at the evidentiary hearing was, in large part, cumulative of the record already established at his trial; and it is clear that failing to introduce cumulative evidence at trial does not give rise to Strickland prejudice. See Wong v. Belmontes, 558 U.S. 15, 130 S.Ct. 383, 388, 175 L.Ed.2d 328 (2009); see also Nobles v. Johnson, 127 F.3d 409, 419 (5th Cir.1997). For example, most of the testimony Wines says he would have given at the criminal trial focused on denying his involvement with the house at 1651 Blue Meadow Street, where the drugs, guns, and money — the physical evidence underlying his convictions and sentences— were found; however, his mother, who, from all accounts was a normal citizen with no criminal record, had already related the relevant parts of Wines’s evidentiary hearing testimony regarding the Blue Meadow *606 house: that Wines had not lived there for six months, that Chappell and Woodson moved into the home after Wines moved out, and that Wines was living with her at the time of the Ouachita Parish arrests. She also corroborated Wines’s claim that he was not cooking crack cocaine with Woodson the night before the arrests and instead was attending a barbeque at her house. In other words, Wines’s alibi was provided by a witness with fewer credibility issues, and the jury chose not to believe the alibi. Ultimately, because Wines’s testimony would have been largely cumulative, Wines’s defense was not prejudiced.
Still further, Wines’s version of some events contradicts his mother’s testimony at trial. Most significantly, Wines’s mother testified that she knew all along that Wines would be traveling to Louisiana with Woodson for their court appearance. On the other hand, Wines testified that he did not decide to go with Woodson to Louisiana until after the barbeque. This inconsistency could easily have been exposed to be an attempt to distance himself from Woodson, and it would have not only undermined his credibility but it would have challenged his mother’s testimony as well.
As we earlier noted, proving prejudice under Strickland is a heavy burden. Indeed, as far as we can determine, no defendant in any court in the United States has been able to prove Strickland prejudice on the basis of his counsel advising him not to testify in his own defense at trial. Wines fails to establish an exception to this record. We therefore conclude that, even if Wines’s counsel was deficient in advising Wines not to testify at trial, his counsel’s error could not be “so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.” Strickland, 466 U.S. at 687,104 S.Ct. 2052.
IV.
In sum, Wines has failed to prove a constitutional claim for ineffective assistance of counsel, because he has not established prejudice under the Strickland test. Because the district court committed no reversible error, the district’s court’s judgment, denying Wines’s § 2255 motion is
AFFIRMED.

. The district court later reduced Wines's sentence pursuant to 18 U.S.C. § 3582(c)(2) to 384 months (32 years).

. Wines also explained that the reason that Chappell — whom Wines denied ever having any drug trafficking association with — was in possession of Wines's stepfather’s truck was because Chappell was a shade-tree mechanic in Dallas and a friend of his stepfather's. Wines said that Chappell probably had the truck for repairs but did not attempt to explain why it was in West Monroe, loaded with nine ounces of crack cocaine.

. Count 1 of the superseding indictment alleged that, “[bjeginning sometime in 1998 ... and continuing through September 30, 2002, in the Western District of Louisiana and elsewhere, the defendant, KENNETH EARL WINES, a.k.a. ‘Crazy’, and other persons both known and unknown ... did knowingly and intentionally conspire and agree together to distribute 50 grams or more of a mixture or substance containing a detectible amount of cocaine base, otherwise known as crack cocaine.”

. Count 2 of the superseding indictment alleged that, "[bjeginning sometime in 1998 ... and continuing through September 30, 2002, in the Western District of Louisiana and elsewhere, the defendant, KENNETH EARL WINES, a.k.a. ‘Crazy’, and other persons both known and unknown ... did knowingly and intentionally conspire and agree together to distribute a mixture or substance containing a detectable amount of marijuana.”

.At sentencing, the district court determined that Wines should serve his sentences for both of these counts concurrently with his conviction for possession with the intent to distribute cocaine base (count 3); the only sentence Wines must serve consecutively is his sentence for possession of a firearm in furtherance of a drug trafficking crime (count 4).

. Wines claims that he was not responsible for some of these convictions. During the evidentiary hearing Wines claimed, "Somebody was using my identity. There’s a couple of them I didn't know nothing about.”