**Opinion filed November 14, 2025**



In The

# Eleventh Court of Appeals

_____

## No. 11-24-00096-CR

_____

**NIKE LEE JOHNSON, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 70th District Court**

**Ector County, Texas**

**Trial Court Cause No. A-21-1376-CR**

## M E M O R A N D U M   O P I N I O N

Appellant, Nike Lee Johnson, was indicted for the offenses of aggravated robbery against Andrew Amoyaw, a first-degree felony (Count One), and aggravated assault with a deadly weapon against Amoyaw, a second-degree felony (Count Two). *See* TEX. PENAL CODE ANN. § 22.02(a)(2)(b) (West Supp. 2024), § 29.03(a), (b) (West 2019). The jury found Appellant guilty of both offenses and assessed his

punishment at ten years' imprisonment and twenty years' imprisonment, respectively, in the Institutional Division of the Texas Department of Criminal Justice. The trial court sentenced him accordingly and ordered Appellant's sentences to be served concurrently.

Appellant challenges his convictions in three issues. In his first issue, Appellant asserts that the trial court erred when it denied his motion for directed verdict. In his second issue, Appellant asserts that the trial court erred when it denied his request for funds to retain an expert in the field of DNA analysis. In his third issue, Appellant asserts that he received ineffective assistance of counsel. We affirm.

## I. *Factual Background*

On the morning of April 7, 2021, Amoyaw exchanged multiple messages on Snapchat with whom he believed was Claudia Perez; however, unbeknownst to Amoyaw, Appellant was the person messaging him with Perez's cell phone. During their messaging, Amoyaw provided Perez with an address near his residence so that they could meet in person to "have a smoke." Appellant drove Perez to the provided address. Once they arrived, Appellant parked "a couple of houses down" from Amoyaw's residence. Appellant instructed Perez to sit in the driver's seat of the vehicle while he positioned himself in the backseat.

Amoyaw then received a message from Perez's cell phone asking him to come outside and to "get in the passenger seat" of the vehicle. As Amoyaw approached the vehicle, he noticed an individual—Appellant—wearing a black hoodie and a black ski mask "pop up" from the backseat. Appellant pointed an "AR-15" rifle at Amoyaw and asked Amoyaw if he "had anything" on him. In response, Amoyaw said he did not "have anything" and offered Appellant a "blunt." Amoyaw then asked Perez to "tell [Appellant] that this is the first time [they were] meeting."

2

At some point, Amoyaw's roommate opened the garage door to leave for work, which briefly distracted Appellant; Amoyaw then attempted to flee. Appellant fired multiple rounds in the direction of Amoyaw as he fled, striking Amoyaw in the arm and the lower right side of his back. Amoyaw continued to flee, and he later called 9-1-1 to report the shooting and to request medical attention. Officer Kaaiako Vavao of the Odessa Police Department responded to the shooting around 5:30 a.m. and provided medical aid to Amoyaw. After an investigation, law enforcement identified Appellant and Perez as suspects to the shooting.

A. *Pretrial Motions and Hearings*

On October 13, 2022, Appellant filed a motion for discovery and requested a list of the State's fact and expert trial witnesses. Four days later, the State filed its original witness list; multiple supplemental notices of potential witnesses were subsequently filed. On April 4, 2023, the State filed its fourth supplemental notice of potential witnesses and identified Laura Baker as an expert in the field of DNA analysis. The certificate of service for the State's notice states that Appellant's attorney of record at the time, Tommy Hull, was served with the notice on April 3, 2023. On April 19, Hull filed a motion to withdraw as Appellant's trial counsel, which the trial court denied the next day. That same day, Appellant submitted a pro se letter to the trial court (dated April 19) which stated that Appellant had terminated Hull as his trial counsel. On April 26, Johanna Curry filed a motion to substitute counsel, which the trial court granted on April 27.[1]

---

[1]Appellant had previously been represented by three different attorneys: Mike Holmes, Michael McLeaish, and Tommy Hull. At a pretrial hearing on April 8, 2024, Curry stated that she was "signed in to counsel on this case on July 12, 2023." Later, during Appellant's trial, Curry was asked by the trial court if she "[agreed] that [she was] on this case by [April 26, 2023]?" In response, Curry stated, "I can't, but if the record shows that date, then I was."

3

Curry filed a motion for speedy trial on January 8, 2024, and an *Ake*[2] motion to appoint a DNA expert on February 8, 2024. The trial court subsequently scheduled a hearing on these motions. As relevant to this appeal, at this hearing, the trial court addressed Curry's *Ake* motion, and the following exchange occurred between the trial court and the State's counsel:

> THE COURT: And is -- does the State have any DNA evidence in this case?
>
> [THE STATE]: Judge, I was looking for that. I don't want to make any representations.
>
> THE COURT: Well, look into it.
>
> [THE STATE]: Will do, Judge.
>
> THE COURT: And find out, and I'll take a look at this in a couple of weeks.

The trial court informed Curry: "certainly if that's an issue . . . I'll, as always, take a look at your motion . . . [a]nd what you have to say about it. And pending that . . . I'll get [Appellant] on the trial docket as soon as possible, again." As a result, the trial court did not rule on Appellant's motion for funds at this hearing. The State subsequently filed subpoena applications for two expert witnesses, including Baker.

On April 8, 2024, the trial court held a pretrial hearing on the parties' pending motions. At this hearing, Curry objected to a lack of notice, stating that she was neither provided nor given notice of "[t]he State's witness list, any State's supplemental witness list, [or] the extraneous offenses." In response, the State contended that "everything in the case had been filed for well over a year before Ms. Curry was on this case . . . so she had ample opportunity to inspect the [trial court's]

---

[2]*See Ake v. Oklahoma*, 470 U.S. 68 (1985).

4

file.  Following this discussion, the trial court overruled Curry's objection.  Notably, Curry did not raise any objection or request that the trial court rule on her *Ake* motion.  Appellant's case proceeded to a jury trial the following day.

B.  *Evidence Presented at Trial*

Amoyaw testified about the circumstances of the shooting and stated that although it was dark, the streetlights in his neighborhood were "pretty bright." According to Amoyaw, the vehicle driven by the shooter was a white "SUV" with "[b]lacked-out windows."  Amoyaw testified that he did not see the shooter's face; however, he described the shooter as being approximately five-foot-nine or five-foot-ten in height and wearing "a black hoodie and a black mask."  Amoyaw testified that the shooter was "a Mexican that sounds like he hangs around a lot of brothers." Amoyaw "researched" Perez after the shooting and discovered that (1) Appellant was in a relationship with Perez, and (2) Appellant and Perez were known drug dealers in the area.

During their encounter, the shooter asked Amoyaw: "what do [you] have" and "[d]o you have anything?"  During cross-examination, Amoyaw admitted that he previously made statements that he believed the masked shooter was "trying to kill [Amoyaw] for being with [the shooter's] girl."

After the State rested, Curry recalled Amoyaw and asked what the masked shooter said to him before the shooting occurred.  Amoyaw testified that the shooter first asked him if "I know his girl."  After this, the shooter asked him "what do you got?"  Amoyaw responded by "show[ing] him the blunt."  Amoyaw stated that although he suspected that jealousy was "one of the reasons" the shooter tried to kill him, he explained that at the time of the shooting, he believed the shooter was "trying to rob . . . [and] kill [him]."

5

Perez testified that she was in a relationship and living with Appellant when the shooting occurred. Perez stated that she was at a friend's house on the day of the shooting, and that Amoyaw messaged her around 5:00 a.m.[3] Around this time, Appellant contacted Perez and offered to give her a ride home. Perez recalled that Appellant picked her up in a "[w]hite Chevy . . . SUV" and that he was wearing dark clothes that day; however, she did not remember if Appellant was wearing a hoodie. After Perez sat in Appellant's vehicle, Appellant discovered that she was messaging Amoyaw. According to Perez, Appellant became "upset" and he began using her cell phone to message Amoyaw, pretending to be her during their conversation. After Appellant messaged Amoyaw, he drove to Amoyaw's house; Perez was seated in the front passenger seat.

Once they arrived there, Appellant told Perez to sit in the driver's seat of the vehicle; Appellant sat in the back seat and pulled a ski mask over his face. At some point, Perez saw an individual—whom she assumed was Amoyaw—approach the vehicle. Perez testified that Appellant exited the vehicle holding a firearm, and he "started asking [Amoyaw] questions." Perez stated that the two men argued for "a couple of minutes" and then she heard multiple gunshots. Although she did not observe the shooting, Perez believed that the gunshots came from a weapon that Appellant discharged. Appellant then entered the vehicle and instructed her to "start driving." Appellant later switched seats with Perez, and he drove them home. According to Perez, Appellant yelled at her as he was driving, stating that the shooting was "her fault . . . because [she] was talking to another man."

Perez described Appellant as "possessive" and jealous. Perez stated that Appellant had been violent during their relationship, that she was afraid of

---

[3]Perez testified that she had exchanged messages with Amoyaw via Snapchat under the username "CPerez2011."

Appellant, and that she believed he was capable of violence because of his jealous tendencies.[4]

Officer Vavao testified that he provided medical assistance to Amoyaw when he arrived at the scene. At the time, Amoyaw told Officer Vavao that he was shot "[o]n Washington . . . by an AR." Officer Vavao later recovered shell casings around the corner from Washington Lane that were consistent with the type of shell casings that an "AR" would discharge.

Detective Lauren Gonzales of the Odessa Police Department testified that she obtained a statement from Amoyaw. Detective Gonzales recalled that Amoyaw described the shooter as a male with a "light-skinned" complexion and a "Mexican accent." She also obtained a statement from Perez, which corroborated Amoyaw's statement and version of events. Additionally, law enforcement officers recovered a black hoodie from the crime scene that, along with a sample of Appellant's DNA, was submitted for forensic testing.

Baker, a forensic scientist with the Department of Public Safety Crime Lab in Lubbock, testified that she performed DNA testing on (1) the black hoodie, and (2) a buccal swab from Appellant.[5] Baker created a DNA profile from the "hood area" of the black hoodie, and she testified that this profile contained a mixture of DNA from three individuals. Baker stated that one of the DNA profiles was consistent with Appellant's DNA profile. According to Baker, the probability that three unknown

---

[4]When asked about previous instances of violence committed against her by Appellant, Perez testified that Appellant struck her two days before he was arrested, and that Appellant had "shot at [her]" on two occasions, once before and once after the April 7 shooting. Photographs of Perez's injuries and the damage to her vehicle were published to the jury.

[5]Prior to this testimony, Appellant's trial counsel objected on the basis that Baker's testimony violated Appellant's Sixth Amendment rights.

individuals, other than Appellant, would be contributors to the DNA found in the black hoodie was one in 378 septillion.

Other evidence was presented at trial that corroborated the testimony of the State's witnesses, including, but not limited to: (1) a transcript of Amoyaw's messaging to Perez's cell phone on Snapchat; (2) a recording of Amoyaw's 9-1-1 call; (3) photographs of the crime scene and evidence recovered by law enforcement during their investigation; (4) Officer Vavao's body camera footage; and (5) a copy of Baker's DNA profile report and findings.

After the State rested, Curry orally moved for a directed verdict for the aggravated robbery offense arguing that the State had failed to prove beyond a reasonable doubt that Appellant was the individual who committed the aggravated robbery or that an aggravated robbery had even occurred on April 7. The trial court denied Appellant's motion, and the jury later found Appellant guilty of both offenses.

## II. *Standard of Review*

### A. *Denial of a Motion for Directed Verdict*

Because we treat the denial of a motion for directed verdict as a challenge to the sufficiency of the evidence, we apply the sufficiency review standard as set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *Williams v. State*, 937 S.W.2d 479, 482 (Tex. Crim. App. 1996); *see Pollock v. State*, 405 S.W.3d 396, 401 (Tex. App.—Fort Worth 2013, no pet.); *Melendez v. State*, No. 11-22-00139-CR, 2024 WL 2194603, at *6 (Tex. App.—Eastland May 16, 2024, no pet.) (mem. op., not designated for publication). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *Jackson*, 443 U.S. at 319; *Garcia v. State*, 667 S.W.3d 756, 761

(Tex. Crim. App. 2023); *Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010).

In conducting a sufficiency review, we consider all the evidence admitted at trial, including evidence that may have been improperly admitted. *Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Brooks v. State*, 323 S.W.3d 893, 899 (Tex. Crim. App. 2010); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's role as the sole judge of the witnesses' credibility and the weight their testimony is to be afforded. *Brooks*, 323 S.W.3d at 899. This standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319; *Clayton*, 235 S.W.3d at 778. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999). Thus, if the record supports conflicting inferences, we presume that the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012); *Clayton*, 235 S.W.3d at 778.

The evidence need not directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing the defendant's guilt, and circumstantial evidence alone can be sufficient to establish guilt. *Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007)). Each fact need not point directly and independently to the defendant's guilt if the cumulative force of all incriminating circumstances is sufficient to support the defendant's conviction. *Hooper*, 214 S.W.3d at 13. Therefore, in evaluating the sufficiency of the evidence, we treat direct and circumstantial evidence equally, and we must consider the cumulative force of all

the evidence. *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017); *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App. 2015); *Isassi*, 330 S.W.3d at 638; *Hooper*, 214 S.W.3d at 13.

Finally, we measure the sufficiency of the evidence by the elements of the charged offense as defined by the hypothetically correct charge for the case. *Morgan v. State*, 501 S.W.3d 84, 89 (Tex. Crim. App. 2016); *see also Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997). In this regard, to determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the offense to the evidence adduced at trial. *Thomas v. State*, 444 S.W.3d 4, 8 (Tex. Crim. App. 2014) (citing *Malik*, 953 S.W.2d at 240). The hypothetically correct charge "accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240.

B. *Accomplice-Witness Testimony*

In reviewing the sufficiency of corroborating evidence, we disregard the accomplice testimony and focus on the remaining portions of the record to determine whether there is any evidence that tends to connect the defendant to the commission of the charged offense. *Solomon v. State*, 49 S.W.3d 356, 361 (Tex. Crim. App. 2001); *Cathey v. State*, 992 S.W.2d 460, 462–63 (Tex. Crim. App. 1999). The corroborating evidence may be direct or circumstantial and need not be sufficient by itself to establish the defendant's guilt; it is sufficient if the combined weight of the non-accomplice evidence tends to connect the defendant to the offense. *Solomon*, 49 S.W.3d at 361; *Gosch v. State*, 829 S.W.2d 775, 777 (Tex. Crim. App. 1991).

10

Such corroboration may come from minor details. *Trevino v. State*, 991 S.W.2d 849, 852 (Tex. Crim. App. 1999).

We review the corroborating evidence in the light most favorable to the verdict. *Taylor v. State*, 328 S.W.3d 574, 578 (Tex. App.—Eastland 2010, pet. ref'd). Once corroborated, the testimony of an accomplice may be considered by the jury in the same manner as other competent evidence. *See Herron v. State*, 86 S.W.3d 621, 632 (Tex. Crim. App. 2002).

C. *Denial of a Request for Funds*

We review a trial court's ruling on a defendant's *Ake* motion and request for funds to hire an expert for an abuse of discretion. *Griffith v. State*, 983 S.W.2d 282, 287 (Tex. Crim. App. 1998). The authorization of funds to an indigent defendant for this purpose is within the sound discretion of the trial court, and an abuse of discretion will not be found unless the defendant shows some specific need for the requested expert or how he would be harmed if the funds were not approved. *See Castillo v. State*, 739 S.W.2d 280, 294 (Tex. Crim. App. 1987) (citing *Phillips v. State*, 701 S.W.2d 875, 894 (Tex. Crim. App. 1985), *overruled on other grounds by Hernandez v. State*, 757 S.W.2d 744, 751 n.15 (Tex. Crim. App. 1988)).

Upon a sufficient showing, an indigent defendant may be constitutionally entitled to the appointment of an expert at the State's expense under *Ake*. *See Ex parte Briggs*, 187 S.W.3d 458, 463, 468 (Tex. Crim. App. 2005). However, the State need not "purchase for the indigent defendant all the assistance that his wealthier counterpart might buy." *Ake*, 470 U.S. at 77; *see Ex parte Jimenez*, 364 S.W.3d 866, 877 (Tex. Crim. App. 2012). "[I]f the defendant makes a sufficient threshold showing of the need for expert assistance on a particular issue, the defendant is entitled to access to at least one expert." *Jimenez*, 364 S.W.3d at 877 (noting that *Ake* does not necessarily require that a defendant is entitled to an expert that will

11

testify on his behalf but, rather, an expert who is available to assist defense counsel with presenting the defendant's case in the best light); *see Ake*, 470 U.S. at 77; *see also* TEX. CODE CRIM. PROC. ANN. arts. 26.05(d), (h), 26.052(f), (g) (West Supp. 2024).

D. *Ineffective Assistance of Counsel*

We review an ineffective-assistance-of-counsel complaint under the two-part standard set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To succeed on a claim of ineffective assistance of counsel, Appellant must satisfy both prongs of the *Strickland* standard: (1) performance and (2) prejudice. *Strickland*, 466 U.S. at 687; *see Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010). The failure to succeed on either *Strickland* prong is fatal to a claim of ineffectiveness. *Perez*, 310 S.W.3d at 893.

First, Appellant must show that trial counsel's representation was deficient in that it fell below an objective standard of reasonableness. *Perez*, 310 S.W.3d at 892–93. Second, Appellant must show that trial counsel's deficient performance prejudiced his defense—that is, counsel's errors were so serious as to deprive Appellant of a fair trial and, as a result, there is a reasonable probability that the outcome of his trial would have been different but for counsel's errors. *Id.* at 893; *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999) (citing *Strickland*, 466 U.S. at 687–88). The "reasonable probability" component must rise to the level such that it is sufficient to undermine confidence in the outcome of the trial. *Strickland*, 466 U.S. at 694. "This is a heavy burden which requires a 'substantial,' and not just a 'conceivable,' likelihood of a different result." *Walker v. State*, 406 S.W.3d 590, 599 (Tex. App.—Eastland 2013, pet. ref'd) (quoting *United States v. Wines*, 691 F.3d 599, 604 (5th Cir. 2012)).

There is a strong presumption that trial counsel's conduct fell within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689; *Isham v. State*, 258 S.W.3d 244, 250 (Tex. App.—Eastland 2008, pet. ref'd). To overcome this deferential presumption, a claim of ineffective assistance of counsel must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Goodspeed v. State*, 187 S.W.3d 390, 392 (Tex. Crim. App. 2005); *Thompson*, 9 S.W.3d at 814; *Walker*, 406 S.W.3d at 593–94. In this regard, we will not inquire into counsel's trial strategy unless no possible basis exists to support such strategy or tactics. *Johnson v. State*, 614 S.W.2d 148, 152 (Tex. Crim. App. [Panel Op.] 1981). Thus, in our analysis, we must make every effort to "eliminate the distorting effects of hindsight." *Strickland*, 466 U.S. at 689.

E. *Ineffective Assistance of Counsel Challenges on Direct Appeal*

In most instances, direct appeal is an inadequate means by which to overcome this presumption and show that trial counsel's representation was deficient and lacked tactical or strategic decision-making, because the record is typically undeveloped and will not show the extent of counsel's conduct and alleged failures. *Goodspeed*, 187 S.W.3d at 392; *Mallet v. State*, 65 S.W.3d 59, 63 (Tex. Crim. App. 2001); *Thompson*, 9 S.W.3d at 813–14. This is especially true when the basis for counsel's trial strategy and decisions do not appear in the record. *Goodspeed*, 187 S.W.3d at 392. In such circumstances, trial counsel should be afforded an opportunity to explain his or her actions before being denounced as ineffective. *Id.*; *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003).

When the record contains no direct evidence of trial counsel's reasons or explanations for the challenged conduct, counsel's performance must be reviewed with great deference and without resort to hindsight, and we "will assume that counsel had a [valid] strategy if any reasonably sound strategic motivation can be

13

imagined." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). We will not speculate about counsel's motives or strategy in the face of a silent record. *Thompson*, 9 S.W.3d at 814. Therefore, if the record is silent as to any reason or explanation for counsel's actions, strategies, and alleged failures, as it is in this case, we "will not conclude [that] the challenged conduct constituted deficient performance unless the conduct was so outrageous that no competent attorney would have engaged in it." *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001); *see also State v. Morales*, 253 S.W.3d 686, 696–97 (Tex. Crim. App. 2008); *Goodspeed*, 187 S.W.3d at 392; *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002) (The defendant must show that there was no plausible, professional reason for counsel's specific acts or omissions.).

## III. *Analysis*

### A. *Motion for Directed Verdict*

In his first issue, Appellant contends that, applying the accomplice-witness rule, the evidence is insufficient to support his convictions. Specifically, Appellant contends that the trial court erred when it denied his motion for directed verdict because the State failed to prove an essential element of each charged offense, and thus the evidence adduced at trial is insufficient to support the jury's verdicts of guilt.

As relevant here, a person commits the offense of robbery if, while in the course of committing theft of property[6] and with the intent to obtain or maintain control of the property, he intentionally, knowingly, or recklessly causes bodily injury to another. PENAL § 29.02(a)(1) (West 2019). "Bodily injury" is defined as "physical pain, . . . or any impairment of physical condition." *Id.* § 1.07(a)(8); *see Lane v. State*, 763 S.W.2d 785, 786 (Tex. Crim. App. 1989). Proof of a completed

---

[6]A person commits the offense of theft when he unlawfully appropriates property with the intent to deprive the owner of said property. *See* PENAL § 31.03(a).

theft is not required to establish the offense of robbery. *See Bustamante v. State*, 106 S.W.3d 738, 740–41 (Tex. Crim. App. 2003). The offense of robbery becomes an aggravated robbery if the person uses or exhibits a deadly weapon during the commission of the robbery. PENAL § 29.03(a)(2). A person commits the offense of aggravated assault if he "intentionally, knowingly, or recklessly causes bodily injury to another" and "uses or exhibits a deadly weapon during the commission of the assault." *See* PENAL §§ 22.01(a)(1), 22.02(a)(2). A firearm is a deadly weapon per se. PENAL § 1.07(a)(17)(A).

The legislature "assigned a broad meaning to the term, 'in the course of committing theft,' [in the robbery statute] to encompass virtually any act [that occurs] immediately before, during, or after a theft." *See Knott v. State*, 513 S.W.3d 779, 793 (Tex. App.—El Paso 2017, pet. ref'd) (citing *Sorrells v. State*, 343 S.W.3d 152, 157–58 (Tex. Crim. App. 2011)). In this context, the Penal Code defines "[i]n the course of committing theft" as "conduct that occurs in an attempt to commit, during the commission, or in immediate flight after the attempt or commission of theft." PENAL § 29.01(1).

Count One of the indictment alleged that, while in the course of committing theft and with the intent to obtain and maintain control of Amoyaw's property, Appellant intentionally, knowingly, and recklessly caused bodily injury to Amoyaw by shooting him and that Appellant used or exhibited a deadly weapon—a firearm. Count Two of the indictment alleged that Appellant intentionally, knowingly, and recklessly caused bodily injury to Amoyaw by shooting him, and that Appellant used or exhibited a deadly weapon—a firearm—during the commission of the assault.

### 1. *Accomplice-Witness Testimony*

Appellant asserts that the only evidence to implicate him to the shooting was Perez's testimony, a witness "who is, or should be, considered an accomplice."

Appellant contends that, as a result, his conviction violates Article 38.14 of the Code of Criminal Procedure. *See* CRIM. PROC. art. 38.14 (West 2023).

To support a conviction based on the testimony of an accomplice, there must be corroborating evidence that tends to connect the accused with the charged offense. CRIM. PROC. art. 38.14; *Malone v. State*, 253 S.W.3d 253, 257 (Tex. Crim. App. 2008). In this regard, we note that the trial court's charge contained a general, corroboration instruction that explained the requirements of accomplice-witness testimony. Nevertheless, in this case, there was sufficient non-accomplice evidence that corroborated Perez's testimony. Perez testified and identified Appellant as the masked shooter. Her testimony shows, among other things, that: (1) Appellant picked her up in a white SUV; (2) Appellant wore a black ski mask when he was in the backseat of the vehicle; (3) it appeared that Appellant was holding a firearm when he exited the vehicle; and (4) minutes after he exited the vehicle, Appellant "started . . . shooting." Perez's testimony was corroborated by Amoyaw, who testified that the vehicle was a white SUV and that the shooter was wearing a ski mask. Perez's testimony was also corroborated by the State's recovery of a black hoodie at the crime scene that was submitted for DNA testing, the results of which were consistent with Appellant's DNA profile.

We conclude that because there is sufficient evidence to corroborate Perez's testimony, the jury could have considered it in the same manner as other competent evidence. *See Herron*, 86 S.W.3d at 632.

### 2. *Sufficiency of the Evidence*

Appellant asserts that the evidence is legally insufficient to prove, beyond a reasonable doubt, that he was the person who committed either charged offense. Specifically, Appellant contends that the evidence is insufficient because: (1) it does not conclusively show that the black hoodie found at the crime scene belonged to

16

him; (2) Baker acknowledged that Appellant's DNA could have been transferred to the black hoodie by means other than by him having worn it during the commission of the charged offenses; (3) Baker's DNA findings did not show whether the hoodie contained gunshot residue or was worn during the crimes; (4) touch DNA is unreliable; and (5) there is insufficient witness testimony in the record. However, based on our review of the record, we conclude that the State adduced legally sufficient evidence to support the jury's verdicts.

Appellant asserts that the DNA mixture evidence is unreliable, and that this data does not provide definitive confirmation of who wore the black hoodie during the commission of these offenses. However, the presence of Appellant's DNA on the black hoodie alone links him to the scene of the crimes. *See King v. State*, 29 S.W.3d 556, 565 (Tex. Crim. App. 2000) (DNA evidence on a cigarette butt found at the scene of a crime indicated the defendant's presence at the crime scene.). Moreover, the mere presence of a second or third, unknown contributor's DNA within the DNA mixture profile does not exonerate Appellant. *See Banks v. State*, No. 11-18-00337-CR, 2020 WL 7863333, at *3 (Tex. App.—Eastland Dec. 31, 2020, pet. ref'd) (mem. op., not designated for publication); *Brown v. State*, No. 02-19-00459-CR, 2020 WL 4689890, at *3 (Tex. App.—Fort Worth Aug. 13, 2020, pet. ref'd) (mem. op., not designated for publication).

Although DNA evidence, without more, is not conclusive of Appellant's guilt, the jury could have drawn reasonable inferences from this and other evidence in making its determination that Appellant committed the charged offenses. *See Brooks*, 323 S.W.3d at 899. Here, Amoyaw testified that (1) the shooter wore a black hoodie and a black ski mask, (2) the shooter arrived at his house in a white SUV after he messaged Perez that morning, and (3) Appellant was in a relationship with Perez when the shooting occurred. Moreover, as we have previously discussed,

17

the jury could consider Perez's testimony in making its determination of the shooter's identity and Appellant's guilt for the charged offenses. *See Herron*, 86 S.W.3d at 632.

The parties agree that there is "[n]o evidence [that] establishes Appellant actually took property from Amoyaw or confessed to anyone an intent to do so"; however, there is sufficient evidence to show that Appellant shot Amoyaw while in the course of committing theft. Amoyaw testified that the masked shooter pointed a gun at his face and asked if he "had anything" on him. When Amoyaw said that he did not, Amoyaw testified: "He proceeded to come with the gun in my -- in his hand and coming close to me, trying to find out what do [sic] I have." From this evidence, a rational jury could have reasonably and logically inferred that: (1) Appellant intended or attempted to steal property from Amoyaw; (2) Appellant shot Amoyaw "in the course of committing theft"; and (3) Appellant intentionally, knowingly, *or* recklessly caused bodily injury to Amoyaw by shooting him. *See Young v. State*, 283 S.W.3d 854, 862 (Tex. Crim. App. 2009) ("[T]he requisite intent to rob may be inferred from circumstantial evidence, particularly the appellant's assaultive conduct."); *see also Wolfe v. State*, 917 S.W.2d 270, 275 (Tex. Crim. App. 1996).

In this case, as in all cases, the jury may believe all, some, or none of any witness's testimony. *Adelman v. State*, 828 S.W.2d 418, 421 (Tex. Crim. App. 1992); *Reyes v. State*, 465 S.W.3d 801, 805 (Tex. App.—Eastland 2015, pet. ref'd) (citing *Sharp v. State*, 707 S.W.2d 611, 614 (Tex. Crim. App. 1986)); *see Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. As the trier of fact, it is the jury's duty to resolve conflicts in the testimony, weigh the evidence, assess the witness's credibility, and to draw reasonable inferences from basic facts to ultimate facts. *See Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Brooks*, 323 S.W.3d at 899; *Clayton*, 235 S.W.3d at 778. It is not our role or function to engage in or make

credibility determinations. *See Jackson*, 443 U.S. at 326; *Winfrey*, 393 S.W.3d at 768; *Brooks*, 323 S.W.3d at 899. Therefore, when the evidence supports conflicting inferences, we presume that the jury, as the factfinder, resolved any conflicts in favor of the verdict, and we defer to that determination. *Jackson*, 443 U.S. at 326; *Merritt*, 368 S.W.3d at 525–26; *Clayton*, 235 S.W.3d at 778.

We have reviewed the evidence in the light most favorable to the jury's verdicts, and we conclude that the record contains sufficient evidence from which a rational jury could have logically inferred and found beyond a reasonable doubt that Appellant was guilty of aggravated robbery and aggravated assault with a deadly weapon as charged in the indictment. *Jackson*, 443 U.S. at 319; *Garcia*, 667 S.W.3d at 761; *Villa*, 514 S.W.3d at 232; *Murray*, 457 S.W.3d at 448; *Hooper*, 214 S.W.3d at 13. Therefore, the trial court did not err when it denied Appellant's motion for directed verdict.

Accordingly, we overrule Appellant's first issue.

B. *Appellant's Request for Funds for a DNA Expert*

In his second issue, Appellant contends that the trial court abused its discretion when it denied his request for funds to retain a DNA expert. Specifically, Appellant asserts that, because of the importance of DNA evidence in the case, the trial court's "denial" of his request for funds was an abuse of discretion.

The State contends that Appellant did not preserve this issue for appellate review for three reasons: (1) Appellant failed to object to or complain about this issue in the trial court; (2) Appellant's argument on appeal does not comport with his objection at trial; and (3) Appellant did not meet his burden to show that he was entitled to funds for a DNA expert because the trial court could not have abused its discretion if it had denied Appellant's pro se motion on this matter. We agree with the State.

To preserve error for appellate review, a party must make a timely objection to the trial court, state the specific grounds for the objection, *and* obtain a ruling. TEX. R. APP. P. 33.1(a). In addition, the trial court must have either ruled or refused to rule on the party's request—in which case the complaining party must have objected to the trial court's refusal to rule. *Id.*; *Burg v. State*, 592 S.W.3d 444, 448–49 (Tex. Crim. App. 2020); *see Wishert v. State*, 654 S.W.3d 317, 331–32 (Tex. App.—Eastland 2022, pet. ref'd). Further, the complaints and arguments raised on appeal must comport with and correspond to the objections the complaining party made, if any, at trial or they are waived. TEX. R. APP. P. 33.1(a)(1)(A); *Broxton v. State*, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995); *Turner v. State*, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991); *Arevalo v. State*, 675 S.W.3d 833, 844–45 (Tex. App.—Eastland 2023, no pet.).

Here, Appellant did not obtain a ruling from the trial court on his objection, nor did he object to the trial court's failure or refusal to rule on his motion for expert witness funds.[7] Moreover, to the extent Appellant raises a due process complaint on these grounds, Appellant's complaint that he now asserts on appeal does not comport with the argument or objection that he made before the trial court on the same issue. *See Ake*, 470 U.S. at 87 n.13 (relying on the Fourteenth Amendment's due process clause); *Jimenez*, 364 S.W.3d at 876 (citing *Ake*, 470 U.S. at 74); *Green v. State*, No. 10-14-00161-CR, 2018 WL 358396, at *3 (Tex. App.—Waco Jan. 10, 2018,

---

[7]In this regard, Appellant attempted to "object in advance" to the State presenting testimony from its DNA expert witness (Baker) while the trial court was appointing an alternate juror. Appellant's trial counsel stated as follows: "I previously asked [the trial court] for a Defense DNA expert . . . and you never granted that motion, or denied it from what I know. So I would object to [the State] now offering DNA [evidence] when I was denied." In response, the trial court instructed Appellant's trial counsel to "approach the bench . . . to make an objection and response when [the witness] is called." Appellant's trial counsel later objected to Baker's testimony when she was called to testify and stated that, "[Appellant] previously filed a motion to get a court appointed DNA expert . . . [and] I believe it was partially denied based on statements by the prosecutor that he did not have DNA involved in this case." Despite these statements, the record does not show that the trial court ever ruled on Appellant's motion.

pet. ref'd) (mem. op., not designated for publication); *see also* Tᴇx. R. Aᴘᴘ. P. 33.1(a)(1)(A); *Thomas v. State*, 505 S.W.3d 916, 924 (Tex. Crim. App. 2016) (the arguments on appeal must comport with the objection raised at trial); *Clark v. State*, 365 S.W.3d 333, 339 (Tex. Crim. App. 2012); *Arevalo*, 675 S.W.3d at 845. As to his broad assertion on appeal that his "right to a fair trial"—presumably under the Sixth Amendment—was violated because he proceeded without a "counter expert regarding DNA," Appellant's objection at trial did not advise the trial court that he was challenging its purported "denial" of the *Ake* motion. As such, we conclude that Appellant failed to preserve and waived this complaint for appellate review. *See* Tᴇx. R. Aᴘᴘ. P. 33.1(a).

Accordingly, we overrule Appellant's second issue.

C. *Ineffective Assistance of Counsel*

In his third issue, Appellant contends that his trial counsel rendered ineffective assistance because: (1) trial counsel failed to "procure" a DNA expert, which compromised Appellant's defense by failing to scrutinize the State's DNA evidence; (2) trial counsel failed to realize that the State had previously disclosed a DNA expert witness for trial, which resulted in the "denial" of his *Ake* motion; and (3) there was a reasonable probability that the outcome of his trial would have been different but for these errors.

In response, the State argues that Appellant failed to establish the *Strickland* prongs because the record does not show that trial counsel's representation was outside the range of reasonable professional assistance. Additionally, the State argues that even if the record is sufficient to address this issue on appeal, Appellant failed to show that the trial court would have abused its discretion by denying Appellant's pro se motion, or that trial counsel's failure to present an expert witness constituted deficient performance.

21

At the outset, we note that Appellant did not file a motion for new trial. As such, Appellant's trial counsel did not have the opportunity to explain or defend her actions or trial strategy or respond to what Appellant now contends constitutes deficient performance. Thus, for Appellant to demonstrate on direct appeal that his trial counsel rendered ineffective assistance, the record must affirmatively show that his counsel's representation fell below an objective standard of reasonableness as a matter of law, and "that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Lopez*, 343 S.W.3d at 143; *see Strickland*, 466 U.S. at 687. Furthermore, when, as here, the record does not reveal counsel's reasoning or strategies, we "presume that counsel is better positioned than the appellate court to judge the pragmatism of the particular case, and that [trial counsel] 'made all significant decisions in the exercise of reasonable professional judgment.'" *Delrio v. State*, 840 S.W.2d 443, 447 (Tex. Crim. App. 1992) (quoting *Strickland*, 466 U.S. at 690); *see Morales*, 253 S.W.3d at 697; *Screws v. State*, 630 S.W.3d 158, 164–65 (Tex. App.—Eastland 2020, no pet.).

According to Appellant, and now with the benefit of hindsight, he would have pursued a different strategy at trial. However, "[t]he mere fact that another attorney might have pursued a different [strategy] at trial does not suffice to prove a claim of ineffective assistance of counsel." *Jimenez*, 364 S.W.3d at 883. The record shows that Appellant's trial counsel chose to aggressively challenge the veracity of Baker's forensic analysis and the results of her DNA profile findings. Based on this record, we cannot say that this decision was so outrageous that no competent attorney would have forgone the same. *Goodspeed*, 187 S.W.3d at 392; *Bone*, 77 S.W.3d at 836; s*ee also Ex parte Flores*, 387 S.W.3d 626, 633 (Tex. Crim. App. 2012) ("It is not enough to show that trial counsel's errors had some conceivable effect on the

outcome' of the proceeding." (quoting *Ex parte Rogers*, 369 S.W.3d 858, 863 (Tex. Crim. App. 2012)).

A claim of ineffective assistance that is based on trial counsel's failure to present witnesses at trial cannot succeed unless the defendant shows that the witnesses were available to testify, and that their testimony would have benefitted the defendant at trial. *Ex parte Ramirez*, 280 S.W.3d 848, 853 (Tex. Crim. App. 2007); *King v. State*, 649 S.W.2d 42, 44 (Tex. Crim. App. 1983); *see Poor v. State*, 715 S.W.3d 15, 39 (Tex. App.—Eastland 2024, pet. ref'd) (op. on reh'g). Here, even if Appellant's trial counsel had retained a DNA expert, we cannot speculate as to what the expert's trial testimony might have been. *See Ramirez*, 280 S.W.3d at 853 (concluding that the applicant's claim that an unpresented witness would have benefitted his defense was "based on pure speculation"); *Brown v. State*, 334 S.W.3d 789, 803 (Tex. App.—Tyler 2010, pet. ref'd) ("[T]he failure to request the appointment of an expert witness is not ineffective assistance in the absence of a showing that the expert would have testified in a manner that benefitted the defendant."). Considering the totality of the evidence in the record, we cannot say that the outcome of Appellant's trial would have been different had no DNA evidence been presented at trial. Similarly, Appellant did not show that his trial counsel's failure to object or otherwise obtain a ruling on Appellant's pro se motion for funds constituted ineffective assistance.

Finally, Appellant asserts for the first time in his reply brief that trial counsel's failure to preserve for appellate review the argument he now advances—that the trial court either failed to rule or refused to rule on his motion for funds—is indicative of counsel's deficient performance. However, we will not consider this argument because (1) Appellant does not provide any authority to support it, and (2) Appellant's argument is beyond the scope of Rule 38.3 and may not be raised for

the first time in this manner. *See* TEX. R. APP. P. 38.1(i), 38.3; *Lagrone v.* State, 942 S.W.2d 602, 614 (Tex. Crim. App. 1997), *cert. denied*, 522 U.S. 917 (1997) ("Without substantive argument or supporting authorities, we cannot adequately evaluate appellant's ineffective assistance claim."); *Heiselbetz v. State*, 906 S.W.2d 500, 512 (Tex. Crim. App. 1995); *Edmondson v. State*, 399 S.W.3d 607, 612 (Tex. App.—Eastland 2013, no pet.); *see Chambers v. State*, 580 S.W.3d 149, 161 (Tex. Crim. App. 2019) (New issues or arguments raised for the first time in a reply brief may not be considered.).

Because the record is not sufficiently developed to affirmatively demonstrate that Appellant's trial counsel had no reasonable strategic basis for her decisions, and because counsel was not provided an opportunity to explain or defend her decisions and trial strategies, we cannot say that her actions and decisions constitute ineffective assistance as Appellant contends. *See Strickland*, 466 U.S. at 687; *Thompson*, 9 S.W.3d at 812; *see also Lopez*, 343 S.W.3d at 142.

Accordingly, we overrule Appellant's third issue.

### IV. *This Court's Ruling*

We affirm the judgments of the trial court.


W. STACY TROTTER

JUSTICE

November 14, 2025

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.